Platinum Equity Advisors, LLC, Platinum Equity Capital Partners, L.P., Platinum Equity Capital Partners-A, L.P., Platinum Equity Capital Partners-PF, L.P., and Platinum Eagle Principals, LLC, Plaintiffs/Counterclaim, Defendants,

against
SDI, Inc., F/K/A Strategic Distribution Holdings, Inc., Defendant/Counterclaim Plaintiff.


653709/2013

For Plaintiffs:
Jill L. Foster, Mark S. Baldwin, and Dylan P. Kletter
Brown Rudnick LLP
For Defendant:
Joel M. Miller and Nicholas Cutaia
Miller & Wrubel P.C.


Eileen Bransten, J.

This action stems from an April 28, 2011 transaction, whereby Plaintiffs Platinum Equity Capital Partners, L.P., Platinum Equity Capital Partners-A, L.P., Platinum Equity Capital Partners-PF, L.P., and Platinum Eagle Principals, LLC (collectively "Sellers") sold all shares in a corporation then known as Project Eagle Holding Corporation ("Project Eagle") to Defendant SDI, Inc. ("SDI" or "Purchaser").[FN1]
Purchaser now claims that the Sellers breached several of the representations and warranties made in the Stock Purchase Agreement ("SPA") that effected the transaction. In turn, Sellers and their representative, Plaintiff Platinum Equity Advisors, LLC ("Sellers' Representative") contend that Purchaser breached the parties' Escrow Agreement by submitting an invalid claim notice and retaining the escrowed funds after they were released.
Both Plaintiffs and Defendants now move for summary judgment (motion sequence numbers 013 and 014). In addition, Plaintiffs seek dismissal of SDI's claims in their entirety on spoliation grounds (motion sequence number 015). All three motions are opposed. For the reasons that follow, Plaintiffs' motion for summary judgment is granted in part and denied in [*2]part, and Defendant's motion for summary judgment is granted. Finally, Plaintiffs' motion for spoliation sanctions is denied.
I.Background
A.Stock Purchase Agreement
On April 28, 2011, Sellers entered into the Stock Purchase Agreement ("SPA"), through which Project Eagle was sold to Defendant SDI. Sellers made several representations and warranties to SDI in the SPA, four of which are relevant to the instant motions:

Section 4.07 — Financial Statements: provides that the Seller's financial statements were "prepared in accordance with GAAP, are based on the books and records of the Company and fairly present in all material respects the consolidated financial position of the Company Entities as at the respective dates thereof and the consolidated statements of operations and cash flows of the Company Entities for the periods indicated "
Section 4.25 — Suppliers and Customers: makes identical representations as to the Seller's "top ten" suppliers and customers, as identified on a disclosure schedule appended to the SPA. The representations state that as of April 29, 2011, "there are no material disputes with any such [top ten supplier or customer] and no Company Entity has received notice from any such [top ten supplier or customer] of its intention to cancel or otherwise terminate its relationship with, or to materially reduce its business with, any of the Company Entities.
Section 4.20 — Taxes: provides, inter alia, that "the Company has in all material respects paid when due (or is contesting in good faith) all Taxes required to be paid by it."
Section 4.29 — Full Disclosure: states that "[n]o representation or warranty by Sellers in this Agreement and no statement contained in any Disclosure Schedule to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."
Under Sections 9.04 and 9.10 of the SPA, SDI's potential damages for any breach of these representations is capped at $7,000,000 unless SDI can establish "intentional breach or fraud."
B.The Indemnity Escrow Fund
Relevant to Platinum's instant motion, Section 2.03(f) of the SPA provided for the establishment of an Indemnity Escrow Fund ("Escrow"), into which SDI deposited $5 million of the purchase price for the transaction at the time of closing. As explained by Plaintiffs, the Escrow was intended to provide a source of payment for SDI in the event it was entitled to indemnification under one of the applicable provisions of the SPA. The Escrow Agreement [FN2]
described the mechanism for such payments.
Specifically, Section 4.1 of the Escrow Agreement provides that SDI was required to submit a claim notice to Plaintiff Platinum Equity Advisors, LLC, i.e., the Sellers' Representative, and former party TD Bank [FN3]
detailing "the facts giving rise to such indemnity [*3]rights and estimat[ing] the amount of the liability arising therefrom " Pursuant to Section 9.1 of the Escrow Agreement, any such notice "shall only be valid if signed by a person listed on Exhibit B under the heading of the Company and the Sellers' Representative, as applicable."
C.The Sellers' Representative's Complaint
In August and November 2012, SDI made claims for indemnification under the Escrow Agreement's terms and served notices of its claims on the Sellers' Representative and TD Bank. The Sellers' Representative contends that SDI's notices were defective and in breach of the Escrow Agreement. Nevertheless, in December 2012, non-party TD Bank released the Escrow to SDI. 
After demanding return of the Escrow, the Sellers' Representative filed a seven-count complaint, of which two claims against SDI now remain: breach of the Escrow Agreement and breach of the SPA. Only the first claim for breach of the Escrow Agreement is at issue on the instant motions.
D.SDI's Complaint
In turn, SDI filed a single count complaint, asserting breach of contract against Sellers. SDI contends that Sellers breached the several of the SPA's representations and warranties, including, inter alia, the Financial Statements, Suppliers and Customers, and Taxes representations in the SPA, as well as made misrepresentations regarding Platinum's use of temporary workers.
II.Summary Judgment Motions
Plaintiffs and SDI each seek summary judgment. Plaintiffs move for dismissal of certain of SDI's breach of contract claims, while SDI seeks summary judgment dismissing Plaintiffs' claim for breach of the Escrow Agreement. These motions are addressed in turn below.
A.Summary Judgment Standard
It is well-understood that summary judgment is a drastic remedy and should only be granted if the moving party has sufficiently established the absence of any material issues of fact, requiring judgment as a matter of law. Vega v. Restani Constr. Corp., 18 NY3d 499, 503 (2012) (citing Alvarez v. Prospect Hosp., 68 NY2d 320, 324 (1986)). Once this showing has been made, the burden shifts to the party opposing the motion to produce evidentiary proof, in admissible form, sufficient to establish the existence of material issues of fact which require a trial of the action. Zuckerman v. City of New York, 49 NY2d 557, 562 (1980). When deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant. Branham v. Loews Orpheum Cinemas, Inc., 8 NY3d 931, 932 (2007). However, mere conclusions, unsubstantiated allegations or expressions of hope are insufficient to defeat a summary judgment motion. Zuckerman, 49 NY2d at 562; see also Ellen v. Lauer, 210 AD2d 87, 90 (1st Dep't 1994) ("[it] is not enough that the party opposing summary judgment insinuate that there might be some question with respect to a material fact in the case. Rather, it is imperative that the party demonstrate, by evidence in admissible form, that an issue of fact exists ...") (citations omitted).
B.Plaintiffs' Summary Judgment Motion (Sequence 013)
Plaintiffs now seek summary judgment dismissing SDI's contract claim insofar as it alleges breach of the Financial Statements, Suppliers and Customers, Taxes, and Full Disclosure [*4]representations in the SPA.[FN4]
Before turning to Plaintiffs' arguments regarding each representation, the Court first must address Plaintiffs' arguments regarding the applicable summary judgment standard.
1.Plaintiffs' Proposed Standard
Plaintiffs contend that this Court must apply a "clear and convincing evidence" standard to their summary judgment motion. Plaintiffs derive this standard from the damages cap in Section 9.04 of the SPA. While the SPA limits SDI's damages for certain indemnification claims to $7,000,000, there is no limitation on damages in cases involving "any intentional breach or fraud." (SPA § 9.04.) Plaintiffs cite to Section 9.04's use of the word "intentional" to insist that SDI's breach claims are barred if the wrongdoing alleged is not tortious in nature. Plaintiffs therefore contend that in order to prevail on its claims, SDI must pierce the contractual limitation on damages by demonstrating intentional wrongdoing. According to Plaintiffs, such a showing must be made by clear and convincing evidence.
The Court disagrees. As a threshold matter, the relevant inquiry for a summary judgment motion is the "existence of material issues of fact which require a trial of the action." Zuckerman v. City of New York, 49 NY2d 557, 562 (1980). Accordingly, summary judgment "is an exercise in issue-finding, not issue-determination." Color by Pergament, Inc. v. Pergament, 241 AD2d 418, 420 (1st Dep't 1987). Therefore, at this juncture, the Court cannot apply a burden of proof, such as clear and convincing evidence, in order to resolve factual disputes raised by the parties; the Court can only identify if such disputes exist for trial. 
2.Application of the Damages Cap
Moreover, Plaintiffs appear to be placing the proverbial cart before the horse in arguing that the damages cap determines whether Plaintiffs can be held liable for breach of contract. The issues of liability and damages are distinct. Plaintiffs can be found liable for breach of the SPA, and SDI's recovery thereunder can be capped at $7 million. If SDI prevails on the issue of liability and then seeks to recover more than $7 million, SDI will need to demonstrate that the cap on damages is inapplicable due to the existence of "intentional breach or fraud" (emphasis added). 
While framed in the disjunctive, Plaintiffs contend that this "intentional breach or fraud" language should be construed by the Court to require SDI to demonstrate fraud for a recovery in excess of $7 million. (Platinum's Br. at 5 (quoting Metro. Life Ins. Co. v. Noble-Lowndes Int'l, Inc., 84 NY2d 430, 438 (1994).) This argument, however, is premised on Plaintiffs' extrapolation of a general rule from a fact-bound Court of Appeals holding. In Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc., the Court of Appeals weighed the application of a contractual cap on consequential damages, which provided an exception for "intentional misrepresentations, or damages arising out of [defendant's] willful acts or gross negligence." Metro. Life Ins. Co., 84 NY2d at 433. Based on this specific language, the Court determined that the damages cap exception for "willful acts" under the contract between the plaintiff-insurer and defendant-technology company would apply only to "conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on [*5]plaintiff at least in part through the means of breaching the contract between the parties." Id. at 438.
The instant contractual language is quite different. The damages cap language here renders the $7,000,000 limitation inapplicable where SDI can demonstrate "intentional breach or fraud." Thus, unlike Metropolitan Life Insurance Co. case, the use of the contractual term "intentional breach" in the instant agreement demonstrates an intent by the parties in this matter to lift the cap on damages for intentional nonperformance of the agreement. See, e.g., Greenfield v. Philles Records, Inc., 98 NY2d 562, 569 (2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."). Under these terms, the Court declines to adopt Plaintiffs' narrow interpretation limiting the damages cap exception to a showing of fraud.
3.Specific Representations
The Court turns now to the specific representations at issue on Plaintiffs' motion. As discussed below, with two exceptions,[FN5]
Plaintiffs' papers highlight a host of factual issues that mandate denial of their summary judgment motion.
a.Financial Statements Representation
In support of their motion, Plaintiffs argue that SDI's has "offered no evidence" that Plaintiffs breached the Financial Statements representation of the SPA. Found at Section 4.07 of the SPA, this representation states that the financial statements given by Sellers to SDI "were prepared in accordance with GAAP" and "fairly present in all material respects the consolidated financial position of" Project Eagle.
Plaintiffs contend that SDI has offered no evidence that the 2010 financial statements given to SDI as part of the due diligence process for the sale of Project Eagle were "materially incorrect." Plaintiffs note that two accounting firms — KPMG and Ernst & Young — reviewed the 2010 financial statements and found no material errors. Accordingly, Plaintiffs assert that the Financial Statements representation was not breached.
In opposition, SDI disputes that KPMG and Ernst & Young "blessed" the Sellers' 2010 financial statements. SDI asserts that Ernst & Young withdrew the audit opinion cited by Plaintiffs stating that "the 2010 Predecessor Financial Statements should no longer be relied upon." See Affidavit of Andrew Belli Ex. 37. Moreover, SDI states that the KPMG and Ernst & Young audits in the first instance contained several disclaimers noting the difficulty of detecting fraud or intentional misstatements where information was hidden from them. Id. Ex. 16, 20. SDI claims that accurate financial information was withheld from the auditors. See, e.g., id. Ex. 39 (February 21, 2012 internal email stating that SDI's CFO was "forcing the margin" by putting fake receivables in SDI's accounting records).
While Plaintiffs dispute the reasons for Ernst & Young's withdrawal of its opinion and the import of this withdrawal, these disputes underscore the existence of material facts in dispute for trial; they do not obviate them such that summary judgment would be appropriate.Further, Plaintiffs' arguments as to whether certain errors were intentional emphasizes the weakness of their summary judgment motion. See, e.g., Shisgal v. Brown, 21 AD3d 845, 847 (1st Dep't 2005) (noting that intent "is ordinarily a question of fact which cannot be resolved on a motion for summary judgment"). Accordingly, Plaintiffs' motion for summary judgment is [*6]denied as to the Financial Statements representation.
b.Suppliers and Customers Representation
Plaintiffs next contend that SDI's claim for breach of Section 4.25 of the SPA — the Suppliers and Customers Representation — must be dismissed. Section 4.25 provides that as of April 29, 2011, "there are no material disputes with any such [top ten supplier or customer] and no Company Entity has received notice from any such [top ten supplier or customer] of its intention to cancel or otherwise terminate its relationship with, or to materially reduce its business with, any of the Company Entities."
First, Plaintiffs argue that summary judgment dismissing SDI's breach claim is appropriate since SDI may or should have been aware of various supplier and customer issues prior to closing and failed to conduct adequate due diligence. As a threshold matter, SDI disputes that it was aware of the issues. While Plaintiffs contend that the Sellers informed SDI that various customers and suppliers were not being timely paid and were placed on "credit holds," see Pls.' Moving Br. at 16, SDI asserts that the Sellers withheld information describing these problems. SDI points to various emails detailing issues with various top ten suppliers and customers. One such purportedly withheld email states "[t]he customer told us today that we are endangering our future business with [top ten customer] Siemens CLT if we don't get this corrected with all vendors ASAP. We are on credit hold now with Hagan Kennington whom provides lubes for the direct side of the business. If we don't deliver these lubes we will shut the plant down." (Belli Aff. Ex. 17.) Again, there are issues of fact as to whether any "material" disputes existed with any customer or supplier and whether any customer or supplier threatened to "materially reduce its business" with the company. Accordingly, this claim cannot be resolved on summary judgment.
Next, even if there was some warning to SDI of a problem with the company's suppliers and customers, such a warning in and of itself does not vitiate the Sellers' representation as a matter of law. In CBS Inc. v. Ziff—Davis Publishing Co., 75 NY2d 496 (1990), the Court of Appeals held that a buyer can recover for breach of warranty even if it had formed doubts as to the truth of the warranted facts prior to the closing. To hold otherwise "would have the effect of denying the express warranties of their only value to [the purchaser]—i.e., as continuing promises by [the seller] to indemnify [the purchaser] if the facts warranted proved to be untrue." Id. at 506. The Court of Appeals noted that "[t]he critical question is not whether the buyer believed in the truth of the warranted information .... but whether [the buyer] believed [the buyer] was purchasing the [seller's] promise [as to its truth]." Id. at 503. There is an exception to this rule where a "buyer closes on a contract in full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty." Galli v. Metz, 973 F.2d 145, 151 (2d Cir. 1992). Nevertheless, there is no such showing of full knowledge and acceptance here on this motion, and in any event, the extent of SDI's knowledge and acceptance likely would pose a question of fact for trial.
c.Taxes and Temporary Labor
Finally, Plaintiffs seek dismissal of the claim that they breached the Taxes representation of the SPA, as well as the claim that the company's use of temporary labor constituted a misrepresentation of the Full Disclosure representation. SDI offers no opposition to Plaintiffs' motion as to these alleged breaches. Accordingly, Plaintiffs' motion is granted and the breach of the SPA claim is dismissed as to these particular allegations.
C.Purchaser's Motion for Summary Judgment (Sequence 014)
SDI next seeks summary judgment dismissing Sellers Representative's claim for breach of the Escrow Agreement. For the reasons that follow, SDI's motion is granted.
This claim stems from SDI's submission of an eight-page claim notice to Sellers' Representative. Through the notice, SDI sought to recover from the Escrow fund, which the parties agree was established in order to provide SDI with a source of payment in the event it was entitled to indemnification under the SPA. 
The following facts are undisputed. On November 14, 2012, SDI issued the claim notice to Sellers' Representative and non-party TD Bank. The notice was printed on SDI letterhead and was executed by SDI's President and Chief Executive Officer, Andrew Cvitanov. SDI sent the notice via fax, FedEx, and email to Sellers' Representative's in-house counsel, as well as its outside counsel. The parties do not dispute that this notice was received by Sellers' Representative on or about November 14, 2012. Under Section 4.2 of the Escrow Agreement, once Sellers' Representative received the claim notice, it had twenty days to deliver a response instructing TD Bank to release all, some, or none of the Escrow amount demanded in the claim notice. Sellers' Representative issued no timely response. Therefore, under Section 4.2, TD Bank released the full amount of the Escrow funds demanded to SDI. For nearly a year, Sellers' Representative took no action with regard to the released Escrow. However, after SDI filed a complaint in Pennsylvania state court asserting tort claims arising from the sale of the company, Sellers' Representative sent a letter to SDI, asserting that it failed to respond the claim notice because it was defective.
Sellers' Representative then filed the instant claim for breach of the Escrow Agreement, premised on the invalidity of SDI's notice. Specifically, Sellers' Representative cites to Section 9.1 of the Escrow Agreement, which states that "[a]ny instruction or notice" delivered by SDI pursuant to the Agreement "shall only be valid if signed by a person listed on Exhibit B [to the Agreement]." Since Exhibit B to the Agreement was left blank, Sellers' Representative maintains that the claim notice it received, which signed by SDI's President and CEO on SDI letterhead, breached Section 9.1 and that SDI's receipt of funds was improper.
SDI seeks dismissal of this breach claim, asserting that its claim notice complied with the terms of the Escrow Agreement as a matter of law, and that even if the claim notice were not in conformity with the Agreement, Sellers' Representative waived its right to object by failing to respond to the notice for nearly a year. The Court agrees.
1.Validity of the Claim Notice
Sellers' Representative challenges the claim notice on the grounds that it was not signed by the correct individual, since no such individual was specified for the task by SDI in Exhibit B to the Escrow Agreement. This construction of the Escrow Agreement, however, would render SDI unable to recover any Escrow funds under any circumstances, notwithstanding the parties' agreement that the purpose of the Escrow Agreement was to provide such a recovery mechanism for SDI.
It is well-settled under New York law that "a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." Cole v. Macklowe, 99 AD3d 595, 596 (1st Dep't 2012); see also ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC, 95 AD3d 498, 503 (1st Dep't 2012) ("It is a longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided.").
If a contract interpretation "depends on formalistic literalism,' ignores common sense, and could lead to absurd results that would leave [another portion of the contract] without meaning," the Court may reject such a reading and adopt in its stead a construction that "produces a commercially reasonable and practical result." Greenwich Capital Fin. Prods., Inc. v. Negrin, 74 AD3d 413, 415 (1st Dep't 2010); see also Castellano v. State of NY, 43 NY2d 909, 911 (1978) ("To carry out the intention of a contract, words may be transposed, rejected, or supplied, to make its meaning more clear.").
Here, the plain language of the Escrow Agreement confirms the parties' intent to create a fund to serve as a source of payment to SDI for indemnity claims arising from the SPA. The preamble to the Agreement states: "WHEREAS, at the Closing, the Purchaser (or the Company on behalf of the Purchaser) shall pay $5,000,000 , which amount shall be held in a segregated account, to serve as a source of payment of any amount owed to any of the Purchaser Indemnitees by the Sellers pursuant to the indemnification obligations set forth in Article IX of the [SPA]." (Escrow Agreement at 1.) The remainder of the Agreement gives effect to that purpose.
Given this clearly expressed intent of the parties, the Escrow Agreement cannot be interpreted in a manner that would serve to prohibit SDI from submitting any claim notice for the Escrow. This is particularly so given the facts of the instant case. SDI submitted a claim notice signed by SDI's President and CEO and submitted on SDI letterhead. Sellers' Representative does not dispute that a corporation may act through its officers or agents. See, e.g., Kirschner v. KPMG LLP, 15 NY3d 446, 465 (2010).
Moreover, there is no dispute that this notice was delivered to Sellers' Representative's inside and outside counsel in compliance with Section 8 of the Escrow Agreement. Sellers' Representative admits that it received the notice on or about the day it was sent and does not claim that any prejudice arose from the fact that the notice was signed by an individual not listed on Exhibit B. See, e.g., Dellicarri v. Hirschfeld, 210 AD2d 584, 585 (3d Dep't 1994) ("Strict compliance with the contract's notice provisions was not required, for defendants do not claim that they did not receive actual notice or that they were in any way prejudiced as a result of this minimal deviation.").
Sellers' Representative attempts to salvage its interpretation by citing to Siegel v. Kentucky Fried Chicken of Long Island, Inc., 67 NY2d 792 (1986). Nonetheless, to the extent applicable, Siegel serves to bolster SDI's construction of the notice provision. In Siegel, the Court of Appeals examined specific contractual language and held that a provision stating that notice must be given to the "Landlord" could be satisfied either by notice to property's landlord or by notice to the "the attorney named in the lease." Siegel, 67 NY2d at 793-94. In so holding, the Siegel Court did not require strict compliance with the notice provision in the lease and held that notice from the attorney — an individual not listed in the provision — was valid. Courts interpreting Siegel have noted that where a lease requires a notice of default to be sent by the landlord, notice may be sent by the landlord's agent where "accompanied by proof of the agent's authority to bind the landlord." Equator Int'l, Inc. v. NH Street Investors, Inc., 43 Misc 3d 251, 262 (Sup. Ct. NY Cnty. 2014) (emphasis added). Thus, to the extent that Siegel is applicable to this case, it holds that an individual not listed in a notice provision may give notice where that individual has the authority to bind the noticing entity. In the instant case, the claim notice was sent by the President and CEO of SDI — an individual with authority to bind the corporation. Therefore, if Siegel is applicable, it nonetheless supports construing SDI's claim notice as valid [*7]under the Escrow Agreement.
2.Waiver
Next, even if the Sellers' Representative had a valid response to SDI's claim notice, it failed to assert that objection within the twenty-day period set forth under Section 4.2 of the Escrow Agreement. Accordingly, under Section 4.2, TD Bank properly released the Escrow to SDI in the full amount demanded.
Sellers' Representative argues that it did not waive its right to object because it learned of the released Escrow a year after the fact, upon receiving SDI's audited financial statements. This contention overlooks two things: (1) the undisputed fact that the Sellers' Representative received the claim notice the day it was sent and (2) Section 4.2's requirement that the Escrow be released in the event that the Sellers' Representative failed to respond to such notice within twenty days. The subsequent receipt of SDI's financial statements did not revive the Sellers' Representative's ability to object to TD Bank's disbursal of the Escrow to SDI under Section 4.2. In addition, Sellers' Representative's insistence that SDI acted deceptively in communicating with TD Bank ex parte to request release of the Escrow is of no relevance. Section 4.2 required the release of the Escrow given Sellers' Representative's failure to act.
***
Accordingly, the Court declines to bar SDI's claim for breach of the Escrow Agreement, and SDI's motion for summary judgment dismissing the breach of the Escrow Agreement claim insofar as it is based on the form of the claim notice is granted.
III.Plaintiffs' Spoliation Motion
In the alternative, Plaintiffs seek dismissal of SDI's complaint in its entirety on spoliation grounds. Plaintiffs contend that SDI failed to preserve documents generated by representatives of non-party Celerant Capital — Nathan Kronfrost, Jamie Better, and Don Rice — and its affiliate non-party Celerant Consulting. Since Kronfrost, Better, and Rice allegedly participated in the due diligence and negotiation of the Project Eagle transaction, Plaintiffs contend that their documents contain information relevant to SDI's claims for breach of the representations and warranties in the SPA. Moreover, Plaintiffs assert that documents pertaining to the diligence of the transaction resided on Celerant Consulting servers, which were not preserved before (or after) the sale of Celerant Consulting to non-party Hitachi. Since the documents from these custodians and servers were not preserved, Plaintiffs contend that the documents have been destroyed.
A.Spoliation Standard
CPLR § 3126 provides that "[i]f any party refuses to obey an order for disclosure or willfully fails to disclose information which the court finds ought to have been disclosed, pursuant to this article, the court may make such orders with regard to the failure or refusal as are just, among them: 3. an order striking out pleadings or parts thereof or dismissing the action or any part thereof " 
A party seeking sanctions under Section 3126 based on spoliation of evidence must demonstrate that "(1) that the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind'; and finally, (3) that the destroyed evidence was relevant to the party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense." VOOM HD Holdings LLC v. EchoStar Satellite L.L.C., 93 AD3d 33, 45 (1st Dep't 2012); see also Ahroner v. Israel Discount Bank of NY 79 AD3d 481, 482 (1st Dep't 2010). The first element of this [*8]analysis is dispositive here.
B.Control
While Plaintiffs seek spoliation sanctions from SDI, Plaintiffs notably do not assert any misconduct by SDI directly. Instead, Plaintiffs seek to punish SDI for the actions of non-parties Celerant Capital and Celerant Consulting (collectively, "Celerant Entities"), and their employees and consultants. Therefore, the threshold matter before the Court is whether SDI exercised sufficient control over the Celerant Entities and its employees and consultants such that SDI — which is not alleged to have failed to meet its own obligations to preserve or produce documents relevant to this action — can be held liable for spoliation sanctions based on the Celerant Entities' nonproduction.
As a general matter, sanctions for destruction of evidence are applied against the entity responsible for the destruction of the evidence. See, e.g., O'Reilly v. Yavorsky, 300 AD2d 456, 457 (2d Dep't 2002) (deeming spoliation sanctions inappropriate where "it cannot be presumed that [sanctioned party] is the party responsible for the disappearance of such evidence or, more importantly, that it was discarded by [sanctioned party] in an effort to frustrate discovery."); McLaughlin v. Brouillet, 289 AD2d 461, 461 (2d Dep't 2001) (concluding that plaintiff should not be sanctioned for spoliation where plaintiff was not responsible for evidence destruction); Hartford Fire Ins. Co. v. Regenerative Bldg. Constr. Inc., 217 AD2d 862, 864 (3d Dep't 2000) (same). 
Plaintiffs do not contend here that SDI destroyed the Celerant Entities' documents or those of their employees and consultants. Instead, Plaintiffs argue that the Celerant Entities should be deemed "the embodiment" of SDI, since SDI is the successor to the holding company formed by Celerant with non-parties Pouschine Cook and LLR (collectively "Purchasing Group") to complete the instant transaction. (Pls.' Reply Br. at 2.) In support, Plaintiffs point to the Purchasing Group's ownership interests in SDI. Pouschine Cook and LLR are alleged to own 20.22% and 50.9% of SDI respectively, while Celerant Capital's stake is 0.76% and Celerant Consulting's is zero. Id. at 3 (citing SDI's Opp. at 3.) Plaintiffs also note that representatives from the Purchasing Group sit on SDI's Board of Directors. Id.
Initially, Plaintiffs' contentions as to Celerant Capital's ownership of SDI appear to undermine their "control" showing, demonstrating that Celerant has control over SDI's documents and not the inverse. Therefore, Plaintiffs' showing would be relevant, if at all, to a motion to hold Celerant liable for SDI's spoliation but not the other way around.
Moreover, the facts of the instant case differ in type and kind from those found to demonstrate control sufficient to impose spoliation sanctions on a non-party. For instance, in Pegasus Aviation I, Inc. v. Varig Logistica S.A., 118 AD3d 428 (1st Dep't 2014), the First Department conducted a spoliation analysis and concluded that a corporation had sufficient control over its direct subsidiary such that the corporation could be deemed to have a duty to ensure that the subsidiary's documents were preserved.[FN6]
In making this determination, the First Department emphasized the nature of the relationship between the "legally and organizationally [*9]distinct entities," which included: (1) the corporation's status as the sole shareholder of the subsidiary; (2) the corporation's selection of the members of the subsidiary's board; (3) the fact that the corporation's employees formulated the business strategy of the subsidiary; and, (4) the corporation's admission that it could obtain documents from the subsidiary upon request. Pegasus Aviation I, Inc., 118 AD3d at 431. Moreover, both the corporation and the subsidiary were parties to the action. Based on these facts, the Pegasus Aviation court concluded that the subsidiary's electronically stored information was "sufficiently under the [corporation's] practical control' to trigger a duty on their part to ensure that those materials were adequately preserved." Id. at 431.
The facts in this case are quite different and do not demonstrate the "practical control" found by the First Department. The Celerant Entities are not parties to this action. SDI is not the sole shareholder of the Celerant Entities — in fact, it is not a shareholder at all. There is no demonstration that SDI is involved in formulating Celerant's business strategy and no admission that SDI could obtain Celerant's documents on request. 
In short, the Pegasus Aviation court determined that a party with sole ownership and control of another entity's business operations, like the parent corporation's control over the subsidiary in that case, can be held liable for failure to preserve the documents of the "downstream" entity's documents. In this case, Plaintiffs seek to invert this holding, asking the Court to determine that SDI be charged with "upstream" control over the Celerant Entities' documents, such that SDI be sanctioned based on the conduct of an "upstream" non-party minority shareholder and its non-shareholder affiliate. 
Based on the facts as presented by Plaintiffs, the Court concludes that the control element has not been satisfied, and as a result, Plaintiffs' motion for spoliation sanctions as to SDI is denied.
IV.Conclusion
Accordingly, it is
ORDERED that Plaintiffs' motion for summary judgment (motion sequence 013) is granted to the extent that Defendants' breach of contract claim is dismissed insofar as it alleges breach of the Taxes representation and breach based on the use of temporary workers, and the motion is otherwise denied; and it is further
ORDERED that Defendant's motion for summary judgment (motion sequence 014) is granted and Plaintiff Platinum Equity Advisors, LLC's claim for breach of the Escrow Agreement is dismissed; and it is further
ORDERED that Plaintiffs' motion to dismiss Defendant's complaint on spoliation grounds (motion sequence 015) is denied; and it is further
ORDERED that counsel are directed to appear for a pretrial conference in Room 442, 60 Centre Street, on August 2, 2016 at 10 AM.
Dated: New York, New York
June 7, 2016
Hon. Eileen Bransten, J.S.C.



Footnotes

Footnote 1:SDI is owned in part by three entities: (i) LLR Partners; (ii) Pouschine Cook Capital Management ("Pouschine"); and (iii) Celerant Capital ("Celerant") (collectively, referred to as the "Purchasing Group"). 

Footnote 2:The parties to the Escrow Agreement were (1) Plaintiff Platinum Equity Advisors, LLC, as the Sellers' Representative; (2) SDI; and, (3) non-party TD Bank, as the Escrow Agent.


Footnote 3:Plaintiffs claims against TD Bank were dismissed by the Court in its Decision and Order on motion sequence 004 (NYSCEF no. 134).

Footnote 4:These allegations are only a subset of the breach allegations contained in SDI's Complaint. See SDI Compl. ¶ 18 ("As stated more fully above, defendants have intentionally breached, inter alia, Sections 4.07, 4.09(a), 4.25(a), 4.17(b), 4.20(b), and 4.29(a) of the Stock Purchase Agreement.").

Footnote 5:The exceptions are the Taxes representation and the temporary workers allegation, which are the portion of Plaintiffs' motion that SDI failed to oppose.

Footnote 6:While the First Department's decision in Pegasus Aviation I was reversed by the Court of Appeals, the reversal was on other grounds and the Court left the control analysis intact. See Pegasus Aviation I, Inc. v. Varig Logistica S.A., 26 NY3d 543, 553-54 (2015) ("On this record, we see no reason to disturb the unanimous finding of the lower courts that the MP defendants had sufficient control over VarigLog to trigger a duty on its part to preserve the ESI.").